IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARIA DE LOURDES QUEZADA CASTRO §
                                                            §
v.                                                          §                    NO.  SA-11-CA-1106-XR
                                                            §
EDGAR PEREZ MARTINEZ                       §
                                                            §

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        Before the Court is Petitioner Maria De Lourdes Quezada Castro's Verified Petition for
Return of Child (Doc. 1.).  The Court held a hearing on February 1 and 2, 2012, at which the
testimony of Petitioner, Respondent Edgar Perez Martinez and various witnesses was heard.  At
the conclusion of the hearing, the Court ordered the minor child returned to the custody of the
mother, Petitioner Quezada Castro.

**Findings of Fact**

1.        Petitioner and Respondent are the parents of Angel Roberto Martinez.  Angel was born in
          Muzquiz, Coahuila, Mexico on March 27, 2008.  Angel was born ten days after his
          expected due date.  He was born with asphyxia and was convulsing the first five days
          after birth.  On June 25, 2008, Angel was seen by a pediatric neurologist and was
          diagnosed with perinatal hypoxic encephalopathy and myoclonic epilepsy.  His general
          physical test was otherwise normal.[1]

2.        Petitioner and Respondent were married on March 19, 2010, at the International Bridge in
          Eagle Pass, Texas.

3.        Petitioner Maria De Lourdes Quezada Castro is a resident of the Republic of Mexico.

4.        From March 27, 2008 through June 2011, Angel continuously lived with his mother in
          Muzquiz, Coahuila, Mexico.  In March of 2010, Petitioner moved to another home
          located in Muzquiz, Coahuila, Mexico.  The home is a simple structure.  The outside of
          the home is covered with lime dust.  Angel was allowed to play in the lime dust and this
          contact has caused Angel unspecified dermatological problems.

5.        Petitioner and Respondent separated from each other in December 2010.

---

          [1]Although Respondent argued that Angel suffers from a brain injury and other medical
ailments, no party provided the Court with any other medical records.

1

6.      In June 2011, Respondent requested permission from Petitioner to take Angel from his home in Mexico to San Antonio, Texas for a one week trip.  Respondent never returned the child to Mexico.

7.      Respondent is a resident of San Antonio, Texas.  The child has been recognized as a United States citizen by the U.S. Consular Office in Mexico.

8.      On or about June 21, 2011, Respondent filed a petition for divorce and request for a Temporary Restraining Order in the 224th Judicial District Court of Bexar County, Texas. In that petition for divorce, Respondent alleged irreconcilable differences and adultery as grounds for the divorce.  No allegation was made that the child was being subjected to any physical harm.

9.      On or about October 11, 2011, Petitioner filed an application for return of the child with the Mexican Central Authority.  See Doc. 1.

10.     On December 22, 2011, Petitioner filed her Verified Petition in this Court.

11.     The United States and the Republic of Mexico are contracting states as defined under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention").

12.     The Republic of Mexico was the child's country of habitual residence prior to June 2011.

13.     The child is currently physically located in the Western District of Texas, San Antonio Division.

14.     Pursuant to Article 3 of the Convention the child was wrongfully retained by Respondent. Petitioner possessed rights of custody, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised by Petitioner, either jointly or alone, or would have been so exercised but for the removal or retention.

15.     Pursuant to Article 13, Respondent has failed to establish that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.  Respondent argues that the following, either individually or in combination, would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation: (1) the area where Respondent lives is subjected to drug cartel activities operated by Los Zetas, and disputed by the Sinaloa Federation and the Gulf Cartel[2]; (2) the child once saw a Mexican police officer

---

[2]Anne E. Ohlrich, a former U.S. State Department foreign services officer, testified that the town of Muzquiz is located at the intersection of narcotics trafficking routes.  Respondent,

2

arrest and possibly beat an individual during the arrest[3]; (3) Petitioner's home is primitive, unorganized, unclean and unsafe[4]; (4) the child possibly saw his mother engage in sexual intercourse because he has mimicked certain acts[5]; (5) the child possibly saw violent acts while in Mexico causing him to be somewhat obsessive about guns and mimicking violent acts[6]; and (6) Petitioner is unable to provide the same quality of health care as Respondent may be able to provide.[7]  Petitioner also attempts to argue that one or more of Petitioner's relatives may be members of a gang cartel or sympathetic to gang cartels.[8]

---

however, provided no competent evidence that the child's home or nearby area has been impacted by drug cartel activity.

[3]Respondent argues that the child becomes withdrawn and afraid when he sees San Antonio police officers.

[4]Various photographs and videotapes were introduced depicting a small, primitive home. The photos indicate the home was not regularly cleaned and is disorganized.  Items normally kept out of reach of small children were displayed openly.  The video showed the child playing in lime dust outside.  Petitioner testified that after the child developed a skin rash, she no longer allowed the child to play in that dust.

[5]The child's grandmother testified that the child has on occasions inappropriately touched her buttocks, breast and attempted to touch her vaginal area.

[6]Respondent argues that the child oftentimes wrestles, states that he is going to "kill you", and shapes his hand like a gun.  He also imitates a slashing gesture and it appears that he is trying to remove intestines.

[7]Dina Trevino, PhD testified that she believes the child should be seen by a pediatric neurologist.  Dr. Trevino testified that the child had an unusually short attention span, had difficulty in regards to behavioral limits, and displayed behaviors that "possibly" suggest he was reenacting something he saw.  Dr. Trevino was unable to state that the child was subjected to sexual abuse or that the child actually witnessed any sexual act.  Indeed, Dr. Trevino wasnot convinced that the child was mimicking a sexual act.  With regard to the repeated play of "killing" and "playing dead", Dr. Trevino was unable to state that the child actually witnessed any murder, but there is a 70% chance that he witnessed some type of traumatic event.  Dr. Trevino also stated that the child could perhaps just be suffering from IQ issues or neurological issues.  Dr. Trevino also testified that she did not know whether the child's separation from his mother was a factor in the child's behavior.

[8]Respondent offered Exhibit 75, a photograph of relatives allegedly flashing a gang sign. Respondent failed, however, to offer any competent evidence that these individuals were members of any gang.

16.     Respondent has failed to establish that Article 20 is applicable (provides that the return of the child may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms).

## Analysis

**The Hague Convention, generally**

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11. The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, Treat Doc., at 7.

The Convention provides that a child abducted in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply.  *Abbott v. Abbott*, 130 S. Ct. 1983, 1987 (2010).  The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.  *Id.* at 1995.  Ordering a return remedy does not alter the exiting allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests.  *Id.*

As explained by the Supreme Court in *Abbot*, 130 S. Ct. at 1989 (citations omitted):

The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply.  A removal is "wrongful" where the child was removed in violation of "rights of custody."  The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence.   The Convention also recognizes "rights of access," but offers no return remedy for a breach of those rights.

The United States is a contracting state to the Convention, and Congress has implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq.*  The statute authorizes a person who seeks a child's return to file a petition in state or federal court, and instructs that the court "shall decide the case in accordance with the Convention."  42 U.S.C. §§ 11603(a), (b), (d).  Suit should be filed in a court in the jurisdiction where the child is physically located. 42 U.S.C. § 11603(b).  If the child in question

4

has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless an exception is applicable. *Id.* (citing § 11601(a)(4)).

**Existence of other custody proceedings**

"For purposes of the Convention, it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal." *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1988 (noting that divorce/custody suit remained pending in state court).

If there is a pending state court action which is attempting to litigate custody, Article 16 of the Convention provides that the state court action "shall not decide the merits of rights of custody until it has been determined that the child is not to be returned" under the Convention.

"Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the wrongdoer. This is true whether the decision as to custody was made, or is entitled to recognition, in the State to which the child has been taken. Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country. This provision is intended to ensure, *inter alia*, that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503-10506 (1986) ((hereinafter Convention Analysis).

The Convention is designed to restore the pre-abduction status quo. *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004). The Convention is not concerned with establishing the person to whom custody of the child will belong at some point in the future; it seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about by the unilateral action by one of the parties. *Id.* (quoting Explanatory Report to the Convention ¶ 71, at 447-48). To this end, the Convention prohibits courts in countries other than that of the child's habitual residence from adjudicating the merits of the underlying custody dispute. *Id.*

**Hague Convention provisions**

Article 3 of the Convention states: The removal or the retention of the child is to be considered wrongful where–

  *a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Article 5 of the Convention states: For the purposes of this Convention-

*a* 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

b 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Article 12 of the Convention states: Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Article 13 provides: Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

*a* the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

*b* there is a grave risk that his or her return would expose the child to psychical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

Article 20 provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State

relating to the protection of human rights and fundamental freedoms."

**Petitioner's case**

The parent seeking return of the child must prove that the child's removal or retention was wrongful within the meaning of the Convention by a preponderance of the evidence.  42 U.S.C. § 11603(e)(1)(A).  A parent wrongfully removes a child when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights.  Convention, art. 3. *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1990 (a child is "wrongfully removed" if he was removed in violation of a right of custody).

country of habitual residence

Neither the Convention nor ICARA define "habitual residence."  A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective.  *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 842 (S.D. Tex. 2006) (citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995).

rights of custody

The Convention recognizes that custody rights can be decreed jointly or alone, and defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  *Abbott*, 130 S. Ct. at 1990*.* The phrase "place of residence" encompasses the child's country of residence.  *Id.*  The right to choose the child's country of residence is a right "relating to the care of the person of the child." *Id.* at 1991.

Pursuant to Article 3 of the Convention, rights of custody may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement.

When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention.  *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004).  Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention; there need not be a custody order in effect to invoke the Convention's return provisions.  Department of State Guidance, 51 Fed. Reg. 10494.

When the country has more than one territorial unit, the habitual residence refers to the particular territorial unit in which the child was resident, and the applicable laws are those in effect in that territorial unit.  Hague Convention, Article 31.  Mexican choice of law rules require

that Mexico apply the law of the Mexican State in which the child was habitually resident immediately prior to the child's removal. *Whallon v. Lynn*, 230 F.3d 450, 456 n.6 (1st Cir. 2000); *but see A.A.M. v. J.L.R.C.*, __ F. Supp. 2d __, 2012 WL 75049 (E.D. N.Y. Jan. 9, 2012) ("Mexico's federal law governs with respect to the scope of petitioner's custody rights for Convention purposes, and supersedes any Mexican state's law to the contrary. See, e.g., José Antonio Márquez González, Family Law in Mexico 80 n.1 (2011) (noting that the code of the Mexican State of Puebla does not define the concept of "parental authority," the Mexican analog to the American law of custody."). The state of Coahuila, pursuant to article 515 of that state's Civil Code, recognizes the doctrine of patria potestas. Pursuant to that doctrine both parents have joint custody rights.

<u>exercise of rights of custody</u>

The Convention protects rights of custody when "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Abbott*, 130 S. Ct. at 1991. The petitioner must allege that he or she actually alleged his or her custody rights at the time of the breach or would have exercised them but for the breach.

The determination whether a party is exercising custody rights closely parallels the determination of the nature and dimension of those rights. *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004). Courts charged with deciding "exercise" under the Convention must not cross the line into consideration of the underlying custody dispute. *Id.* To avoid this possibility, American courts interpret "exercise" broadly, and thus, in the absence of a ruling from a court in the country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights." *Id.* at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.*

**Respondent's case**

Even if the child has been wrongfully removed, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. *Abbott*, 130 S. Ct. at 1997. If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, see 42 U.S.C. § 11603(e)(1), the burden shifts to a respondent to prove an applicable affirmative defense. Several such defenses are available if a respondent "opposes the return of the child." 42 U.S.C. § 11603(e)(2).

A respondent may show by clear and convincing evidence that there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); see 42 U.S.C. § 11603(e)(2)(A).

A respondent may show by clear and convincing evidence that the return of the child

"would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; see 42 U.S.C. § 11603(e)(2)(A).

grave risk of physical or psychological harm

Article 13(b) provides an exception to return in the event of a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."   A party opposing a child's return must prove the existence of a grave risk by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A).

Even if this "narrow" exception applies, a federal court has "and should use when appropriate" the discretion to return a child to his or her place of habitual residence "if return would further the aims of the Convention."  *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)).

Evidence of adjustment problems attending relocation and separation from a parent are inapposite to the grave risk determination.  *England*, 234 F.3d at 271; *Morrison v. Dietz*, 2008 WL 4280030 (W.D. La. 2008), *aff'd on other grounds*, 349 Fed. Appx. 930 (5th Cir.  2009).

The Department of State Guidance states that "[t]his provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious."  Convention Analysis.

"[W]hile all jurists would agree that some level of domestic abuse will trigger the Article 13b exception, the more difficult question is at precisely what level will return expose the child to a 'grave risk of harm or place the child in an 'intolerable situation'?"  *Simcox v. Simcox*, 511 F.3d 594,  605 (6th Cir. 2007). The Sixth Circuit stated that there is no clear answer, though it had favorably cited a State Department report that states, "The person opposing the child's return must show that the risk to the child is grave, not merely serious."  *Id.* (citing *Friedrich II*, 78 F.3d at 1068 (citing Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)). The same report also noted that "[a]n example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child" because such circumstances would constitute "a grave risk of psychological harm." *Friedrich II*, 78 F.3d at 1069.

In *Vazquez v. Estrada*, Civ. A. No. 3:10-CV2519, 2011 WL 196164 (N.D. Tex. Jan. 19, 2011), the removing parent argued that returning the child to Mexico would expose her to a grave risk of physical harm due to the "spiraling violence and surge in murders in Monterrey" and because of "specific violent acts that have been committed in the school [the child] attended in Monterrey and in the neighborhood where Petitioner resides."  The court found that the removing

parent failed to establish the exception by clear and convincing evidence:

> Like the other defenses, the grave risk defense must be narrowly construed. The defense was not intended to encompass situations such as the return to a home where money is in short supply or where educational opportunities are more limited. Instead, a grave risk or intolerable situation exists where return of the child would send the child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect.
>
> Respondent provided evidence that there has been a surge of violent activity in Monterrey due to drug cartel activity and that the neighborhood where Petitioner lives is dangerous. This is not sufficient to find that Monterrey is a "zone of war." *See Silverman*, 338 F.3d at 900-01 (finding that general regional violence in Israel does not establish a "zone of war"); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365-66 (finding civil instability and presence of violent demonstrations in Argentina did not amount to a "grave risk" or "intolerable situation"). Respondent has failed to establish by clear and convincing evidence that a grave risk of physical harm exists.

*Id.* at *5 (some citations omitted); *see also Avendano v. Smith*, __ F. Supp. 2d__, 2011 WL 5223041, at *22 (D. N.M. Aug. 19, 2011) ("Although Mexico is more dangerous than the United States at this time, the term intolerable situation was not meant to encompass return to a home where living conditions are less palatable.").

In *Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003), the Eighth Circuit held that evidence of "general regional violence, such as suicide bombers, that threatened everyone in Israel" was not sufficient to establish a "zone of war" that put the children in "grave risk of physical or psychological harm" under the Convention.

The Seventh Circuit recently re-emphasized that "[c]oncern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense; but the safety of children is paramount.  Because the court in this sort of case is responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself, we have stressed that the risk of harm must truly be grave.  The respondent must present clear and convincing evidence of this grave harm because any more lenient standard would create a situation where the exception would swallow the rule."  *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011) (internal quotations and citations omitted).

Article 20

This exception was intended to be narrowly applied and is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed."  Department of State Guidance, 51 Fed. Reg. 10494.  The

"language of Article 20 has no known precedent in other international agreements to serve as a guide in its interpretation." Public Notice 957, 51 Fed. Reg. 10494, 10511 (March 26, 1986). "Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters." *Id.*

The court in *Stirzaker v. Beltran*, 2010 WL 1418388 (D. Idaho 2010) rejected an argument that corruption in Mexico would make a fair custody determination impossible and that the child's rights as a United States citizen would not be protected.

**Psychological Reports**

Psychological reports may be relevant to the grave risk determination. *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 378 (8th Cir. 2005). Those relating to psychological profiles and evidence about parental fitness, lifestyles, and relationships are irrelevant to the Article 13b inquiry, but to ensure that the child is adequately protected, the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence, and to that end a psychological report may be relevant. *Id.*

**Attorney's Fees and Costs**

Under ICARA, "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, ..., and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3).

**Conclusions of Law**

Pursuant to Article 3 of the Convention the child was wrongfully retained by Respondent. Petitioner possessed rights of custody, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised by Petitioner, either jointly or alone, or would have been so exercised but for the removal or retention.

Pursuant to Article 13, Respondent has failed to establish by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

Respondent has failed to establish that Article 20 mandates denial of Petitioner's Petition

11

for the return of the child.

Petitioner's motion for return of the child is GRANTED.

Citing 42 U.S.C. §11604, Respondent alternatively requests the Court abate or stay this Order to allow for pediatric neurological testing of the child.  Staying the return of a child in an action under the Hague Convention on the Civil Aspects of International Child Abduction should not be granted as a matter of course.  *See Charalambous v. Charalambous*, 744 F. Supp.2d 375 (D. Me. 2010).  Respondent has not established that the child is unable to receive appropriate medical testing and treatment in Mexico.  That request is DENIED.

## JUDGMENT

Accordingly, because the Court finds that the habitual residence of the minor child is the Republic of Mexico and that Respondent's retention of the child in the United States is wrongful, the Court ORDERS that the minor child be returned forthwith to the custody of Petitioner. Respondent is ordered to pay court costs and attorney's fees reasonably incurred, including the costs of the guardian ad litem.

It is so ORDERED.

SIGNED this 2nd day of February, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

12